Filed 5/19/14  P. v. Payne CA3
Opinion following order vacating prior opinion

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C062753 |
| v. | (Super. Ct. No. SF103260A) |
| BRIAN DAVID PAYNE, | |
| Defendant and Appellant. | |

A jury convicted defendant Brian David Payne of first degree murder, shooting at an occupied motor vehicle, criminal threats, misdemeanor vandalism, and inflicting corporal injury on a spouse.  The trial court sentenced defendant to 25 years to life in prison, with an additional term of 25 years to life for a firearms-use enhancement, and various concurrent terms.

Among other things, issues arose during trial regarding defendant's competence to assist counsel in a rational manner and his requests to relieve his appointed trial counsel.

1

Defendant now contends:

1. The trial court erroneously instructed the jury on the requisite mental state for heat of passion, and the prosecutor committed misconduct by misstating the law on heat of passion. If either of those arguments are deemed forfeited, defendant claims defense counsel rendered ineffective assistance by failing to object at trial to those errors.

2. The trial court abused its discretion by not providing a clarifying instruction on provocation sufficient to reduce first degree murder to second degree murder, after the jury foreperson indicated that a holdout juror did not understand the concept.

3. Defense counsel was ineffective in failing to prevent disclosure at the competency trial of privileged information, the trial court abused its discretion in considering inadmissible hearsay, and the cumulative effect of the errors requires reversal of the competency determination and the sanity verdict.

4. The trial court prejudicially erred in denying his motions to discharge his trial counsel.

We conclude:

1. The jury was properly instructed on heat of passion, and defendant forfeited his claim of prosecutorial misconduct. Defendant's ineffective assistance claim fails because he has not established prejudice.

2. Defendant forfeited his claim that the trial court should have provided a clarifying instruction on provocation, because he acquiesced to the trial court's response to the jury inquiry.

3. The record does not support defendant's claim of attorney-client privilege, and defendant's ultimate claim of ineffective assistance fails because he has not established prejudice.

4. The trial court acted within its discretion in denying defendant's motions to substitute his appointed trial counsel.

We will affirm the judgment.

2

BACKGROUND

Defendant was married to the victim, Jamie Baker, and the couple had three children: Brian, Jr., Markus, and Aiden. But the relationship between defendant and his wife began to deteriorate beginning in August 2006. Defendant suspected Jamie was having an affair. He heard a message from a man on Jamie's cell phone, and defendant claimed Jamie showed him responses she received from other men on a dating website she had visited, causing defendant to become angry and jealous. Defendant accused Jamie of cheating on him and kicked her in the back when she refused to have sex with him on one occasion in December 2006.

Defendant told his coworker he would kill Jamie if she ever left him. He said he put a gun on Jamie to scare her. Jamie's friend, Hillary Hays, overheard defendant threaten to kill Jamie during a cell phone conversation in November 2006. Defendant said he did not want Jamie to be with anyone else.

Defendant read subsequent texts on Jamie's cell phone and learned that three men had contacted her. One text sent from Jamie's cell phone read, "I can't wait to rub on your rock-hard chest again." The texts on Jamie's cell phone confirmed defendant's suspicion that Jamie was unfaithful. Defendant felt his marriage was a joke and Jamie was using him, but he still wanted to work things out. In a fit of rage, defendant slashed Jamie's car tires and choked her on January 10, 2007. Jamie summoned the police, moved out of the apartment she shared with defendant, and went to live with Hays.

Jamie reported to police that defendant constantly harassed her after she moved in with Hays. He called Hays's home about 20 times inquiring about Jamie and showed up at Hays's apartment. He said he would kill Jamie before he allowed her to be with someone else. On one occasion, he took the ignition wire out of Jamie's car to prevent her from leaving.

Jamie obtained an emergency protective order against defendant. She planned to take the children to Texas, but defendant convinced her to stop along the freeway so that

3

he could say goodbye to the children. However, defendant took Aiden out of Jamie's car and left, saying Jamie would never see Aiden again and that he would kill Jamie. Jamie called the authorities.

Defendant left Aiden with Jamie's mother the next day, and Jamie took the children to Texas. Jamie would not allow the children to tell defendant where they were, but she permitted defendant to talk to Brian, Jr. and Markus on the telephone. Jamie told Hays she wanted to get as far away from defendant as she could get.

After Jamie left with the children, defendant smoked cocaine constantly. He stopped going to work. He smoked between 7 to 10.5 grams of cocaine each day for seven days. The cocaine made defendant depressed. He was not sleeping and eating. He began to hear Markus's voice calling him. He believed Jamie or her boyfriend might kill him or set him up, so he kept his handgun by his bed for protection. At some point in time, defendant wrote a note which said, "The enemy is Jamie Baker, bitch, mother fucker."

Defendant killed Jamie on January 28, 2007. That morning, he met Jamie at a Panda Express restaurant near his apartment. Jamie asked to meet to discuss things with defendant. She wanted to meet at a public place because she was afraid of defendant. Jamie left the children with defendant's sister in Texas.

Defendant stopped smoking cocaine about two hours before he had to meet Jamie. He did not trust himself that day.

Defendant wanted to save his marriage and to go to counseling. Jamie was adamant, however, that their relationship was over. She told defendant the children were at his sister's house in Dallas. Defendant told Jamie the children belonged with him, and Jamie responded that she would think about it. Defendant felt Jamie held all the cards. He and Jamie left the restaurant at 12:45 p.m.

Defendant returned to his apartment and smoked cocaine. He felt low. He thought "it's pretty much over. Your wife's gone. You don't know where your kids are.

4

You got $300 left in the bank. Go draw 200 out, get on the freeway, turn your music on, and go get another quarter [of cocaine]."

After using an ATM machine, defendant departed from a parking lot in his car. His gun was on the front seat of the car, and he knew the gun was loaded. Defendant saw Jamie's car make a turn at an intersection. She did not see him. Defendant pulled his car next to Jamie's car and got out of his car with his gun. He held his gun low. He wanted answers from Jamie about his children, and he wanted to scare Jamie.

Defendant repeatedly ordered Jamie to unlock her car doors. She said no and began to move her car backwards. Defendant hit his gun on the car window, and the gun discharged. After that, he pointed the gun at Jamie and fired 15 shots. Defendant was a good shot, and he knew the gun was empty when he finished shooting. Twelve out of 15 bullets hit Jamie, killing her.

Defendant left in his car and went straight to his drug dealer's house. He did not call 911. Instead, he called Jamie's mother and others, confessing what he had done and claiming he was going to kill himself.

Defendant drove to Walnut Grove to get high. He turned off his cell phone. He took off his white shirt to avoid detection. He sat in a field thick with brush and smoked cocaine. Law enforcement officers eventually found defendant in the field and took him into custody. Defendant told detectives Jamie cheated on him and "she just kept doing it," "[j]ust kept going on and on, lying and lying. She wouldn't stop. Said she was afraid of [defendant], but still kept doing it." He said Jamie wanted to leave and he agreed but he wanted her to leave the children with him and she took the children to hurt defendant. He said Jamie told him at the Panda Express restaurant that she hated him and was "doing all this stuff on purpose." Defendant said he shot Jamie because he was angry about all of the things she did to him and because she did not give a damn.

Additional background information is included in the discussion portion of this opinion where relevant to the contentions on appeal.

5

The jury convicted defendant of first degree murder (Pen. Code, § 187 -- count 1),[1] shooting at an occupied motor vehicle (§ 246 -- count 2), criminal threats (§ 422 -- count 3), misdemeanor vandalism (§ 594, subd. (a) -- count 4) and inflicting corporal injury on a spouse (§ 273.5, subd. (a) -- count 5). The jury also found that in the commission of the offenses charged in counts 1 and 2, defendant intentionally and personally discharged a firearm causing great bodily injury to Jamie (§ 12022.53, subd. (d)).

The trial court sentenced defendant to a prison term of 25 years to life on count 1, with an additional term of 25 years to life pursuant to the firearms-use enhancement (§ 12022.53, subd. (d)), a concurrent three-year term on count 3, a concurrent one-year term on count 4, and a concurrent four-year term on count 5. The trial court imposed and stayed a prison term for the conviction on count 2.

## DISCUSSION

### I

Defendant contends (A) the trial court erroneously instructed the jury on the requisite mental state for heat of passion, (B) the prosecutor committed misconduct by misstating the law on heat of passion, and (C) if either of those arguments are deemed forfeited, defendant claims defense counsel rendered ineffective assistance by failing to object at trial to those errors.

### A

We begin with defendant's argument that the trial court erroneously instructed the jury on the requisite mental state for heat of passion. Defendant admitted killing Jamie, but claimed he acted out of a heat of passion. He asked the trial court to instruct the jury on voluntary manslaughter based on heat of passion pursuant to CALCRIM No. 570.

---

[1] Undesignated statutory references are to the Penal Code.

6

The trial court instructed the jury pursuant to former CALCRIM No. 570, which at the time included the following sentence: "In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts."[2] Defendant argues that sentence misstated the law. He says the trial court's instruction erroneously allowed the jury to base its decision on whether the provocation would have caused an average person to do what defendant did, i.e., commit a homicide.

Defendant's contention lacks merit. The California Supreme Court has approved the challenged language. (*People v. Beltran* (2013) 56 Cal.4th 935, 954 (*Beltran*).) "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*Id.* at p. 942, fn. omitted; see also § 192, subd. (a).) Whether the provocation suffices to constitute heat of passion focuses on the defendant's state of mind, not his particular act. (*Beltran, supra,* 56 Cal.4th at p. 949.) "[P]rovocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Ibid.*, italics omitted.)

---

**2** CALCRIM No. 570 was amended after defendant's trial. The amended instruction replaced the sentence "[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts" with the following: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570 (December 2008 supp.).)

The California Supreme Court examined the former version of CALCRIM No. 570 challenged here and held the instruction was not ambiguous and did not improperly allow jurors to consider whether the provocation would cause an average person to do what the defendant did. (*Beltran, supra*, 56 Cal.4th at p. 954.) Instead, the instruction properly drew the jury's attention to the effect the provocation would have on the state of mind of an ordinarily reasonable person. (*Ibid.*) Following *Beltran,* we reject defendant's claim of instructional error.

Accordingly, it is not necessary for us to discuss defendant's due process, Sixth Amendment, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435], and prejudicial error claims because we conclude the CALCRIM No. 570 instruction given to the jury was not erroneous.

B

Defendant next claims the prosecutor committed misconduct by misstating the law on heat of passion. The prosecutor argued: "You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would act. [¶] That means, would a reasonable person have put 14 holes in his wife? No, not if they have that history of abuse. But a murderer would."[3]

We agree the prosecutor misstated the law when he suggested that in deciding whether the provocation was sufficient, the jury should consider whether a person of average disposition would have put 14 holes in his wife. (*Beltran, supra*, 56 Cal.4th at pp. 949, 954.) However, defendant forfeited his claim of prosecutorial misconduct by failing to object at trial and failing to request a jury admonition. (*People v. Samayoa*

[3] Defendant fired 15 shots. Twelve bullets hit Jamie. Two of the bullets left in-and-out wounds, resulting in 14 holes.

(1997) 15 Cal.4th 795, 841.)  Defendant does not contend that an objection or a request for admonition would have been futile.  (*People v. Najera* (2006) 138 Cal.App.4th 212, 224 [a defendant is excused from objecting and requesting an admonition if either would have been futile].)

C

Anticipating that his claim may be forfeited, defendant asserts ineffective assistance of counsel based on his trial counsel's failure to object to the prosecutor's statement about the requisite mental state for finding heat of passion.

A defendant claiming ineffective assistance of counsel must affirmatively establish each element of a dual-pronged test:  (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient representation prejudiced defendant.  (*People v. Maury* (2003) 30 Cal.4th 342, 389 (*Maury*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).)  If a defendant fails to establish either prong, the judgment must be upheld.  (*Strickland, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693].) We " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.' " (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020; *Strickland, supra*, at p. 697 [80 L.Ed.2d at p. 699].)

With regard to the second prong, defendant must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the defendant would have obtained a more favorable result.  (*Maury, supra*, 30 Cal.4th at p. 389; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218; *Strickland, supra*, 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].)  A reasonable probability is a probability sufficient to undermine confidence in the conviction.  (*Maury, supra*, 30 Cal.4th at p. 389.)  It is not

9

enough for defendant to show that errors had some conceivable effect on the outcome of the case.  (*People v. Ledesma, supra*, 43 Cal.3d at p. 217.)

Defendant fails to establish prejudice because it is not reasonably probable that the jury disregarded the trial court's instructions and instead applied the prosecutor's argument concerning heat of passion.  The jury asked the trial court for clarification concerning the CALCRIM No. 570 instruction.  In particular, the jury asked:  "If we all agree a person of average disposition would 'not' have acted in the same manner does that mean this crime is not heat of passion."  The trial court responded by referring the jury back to the elements stated in the CALCRIM No. 570 instruction.  As we explained, *ante*, the CALCRIM No. 570 instruction correctly stated the law on the requisite state of mind for heat of passion.  (*People v. Beltran, supra*, 56 Cal.4th at pp. 954-956 [finding no prejudice arising from any ambiguity created by counsel's closing statements where the jury requested clarification of the standard from the trial court and the trial court correctly explained the requisite mental state].)  The trial court also directed the jury to follow the law as the trial court explained it.  Absent contrary indication, we presume the jury followed those instructions.  (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

Moreover, compelling evidence supports the finding that defendant intended to kill Jamie or deliberately acted with conscious disregard for Jamie's life and the killing was done willfully, deliberately and with premeditation.  Defendant threatened to kill Jamie on multiple occasions before he shot her.  He also admitted that he had thought about killing Jamie.  He candidly testified that he did not trust himself on the day of the shooting.  Defendant's belongings were packed in a suitcase and a gun holster was left on top of the suitcase on the day of the shooting, suggesting preparatory action by defendant.

Even if Jamie's conduct provoked anger or jealousy in defendant, defendant had sufficient time to cool off.  (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458 [" ' "the rule is that, if sufficient time has ela[p]sed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." [Citation.]' "].)  Jamie left with

10

the children nine days before the shooting. Defendant claimed he wanted answers from Jamie about the children, but defendant spoke with his children during the time they were with Jamie, and Jamie told defendant where the children were. In addition, about 50 minutes elapsed between the time defendant's meeting with Jamie ended and the time of the shooting. (*People v. Dixon* (1961) 192 Cal.App.2d 88, 90-91 [the defendant did not act in the heat of passion where 30 to 40 minutes elapsed from the time of the dispute between the defendant and the victim to the time of the killing].) Defendant returned to his apartment and later followed Jamie with his gun. He parked his car near Jamie's car and held his gun low, hiding it from Jamie's view. He pointed the gun at Jamie and shot at her 15 times, carrying out his prior threats to kill her. Defendant also had the presence of mind to immediately flee after he shot Jamie and to take measures to avoid detection by the police. Defendant's actions and the lapse of time between his meeting with Jamie and the shooting demonstrate that defendant acted with intent to kill or a conscious disregard for life and with deliberation and premeditation, rather than from a heat of passion.

Unlike *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), a case defendant analogizes to his, there is evidence contradicting defendant's claim of provocation. Although defendant said Jamie continued to have sex with him after she moved out of their apartment, Hays's testimony and Jamie's conduct indicate Jamie was afraid of defendant and wanted nothing to do with him. Hays said Jamie returned to the couple's apartment to take care of their son when defendant was at work, but Jamie lived with Hays until Jamie left for Texas. Jamie told police she was afraid of defendant. Jamie said she wanted to get as far away from defendant as she could. And on the day of the shooting she refused to continue her relationship with defendant. The jury was not required to accept defendant's claim that Jamie created a "push-pull relationship" which provoked him to act rashly from passion on the day of the shooting.

11

On this record, it is not reasonably probable that defendant suffered prejudice from defense counsel's failure to object to the prosecutor's misstatement. We reject defendant's ineffective assistance claim.

II

Defendant also argues the trial court abused its discretion by not providing a clarifying instruction on provocation sufficient to reduce first degree murder to second degree murder, after the jury foreperson indicated that a holdout juror did not understand the concept. Defendant claims the error violated his rights to due process and to a jury trial.

Defendant's contention fails because he agreed with the trial court's response to the jury inquiries. Defense counsel did not request any additional jury instruction. Defendant's acquiescence in the trial court's response to the jury's questions forfeits a claim of error on appeal as to that response. (*People v. Harris* (2008) 43 Cal.4th 1269, 1317-1318; *People v. Rogers* (2006) 39 Cal.4th 826, 877; *People v. Marks* (2003) 31 Cal.4th 197, 237.)

In any event, there is no merit in defendant's contention that the trial court was obligated to further instruct the jury on provocation. Section 1138 requires a trial court to provide a deliberating jury with information the jury desires on points of law. (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539.) We review a trial court's decision on whether to instruct a deliberating jury under the deferential abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746; *People v. Hodges, supra,* 213 Cal.App.4th at p. 539.) Here, however, the record does not support defendant's claim that the jury requested clarification about provocation as it relates to the degrees of murder. After deliberating for three days, the jury unanimously agreed that defendant committed murder, but the jurors could not agree on the degree of murder. There was one holdout juror. The jury foreperson requested further assistance from the trial court with regard to the holdout juror's apparent bias against the prosecution and illogical consideration of the

evidence. But the jury did not request further instruction concerning provocation or heat of passion after the trial court reinstructed with CALCRIM No. 570. The trial court waited for the jury to provide further guidance about what assistance it needed from the trial court, following hearings on possible juror bias and misconduct. The jury, however, did not request additional instruction. We find no error in the trial court's analysis of the jury's notes and of the statements by the jurors who were questioned. (*People v. Haskett* (1990) 52 Cal.3d 210, 232 [deferring to the trial court because it is in a better position than the appellate court to interpret the tone and nuances of problems in the jury room].)

We also cannot agree with defendant's contention that the record shows the jury misunderstood the standard for finding provocation for purposes of considering whether defendant committed first or second degree murder. Read in context, the jury's notes and the jury foreperson's statements indicated a concern about the holdout juror's bias against the prosecution and her consideration of the evidence, not her understanding of the law concerning provocation or heat of passion. In other words, the majority of the jury was concerned the holdout juror was incorrectly applying the law, not that the holdout juror (or conversely the rest of the jurors) misunderstood the law. The trial court did not abuse its discretion in not providing further instruction on provocation.

Defendant also claims his counsel's failure to request a clarifying instruction on provocation constituted ineffective assistance. We reject the claim because there was a reasonable tactical reason for defense counsel's omission. (*People v. Mattson* (1990) 50 Cal.3d 826, 876.) The jury could not agree on a verdict on the murder count. Defense counsel may have decided not to object or request further instruction because counsel wanted a mistrial on that count.

### III

Defendant claims (A) defense counsel was ineffective in failing to prevent disclosure of privileged information at the competency trial, (B) the trial court abused its

13

discretion in considering inadmissible hearsay, and (C) the cumulative effect of the errors requires reversal of the competency determination and the sanity verdict.[4]

Before addressing defendant's contentions, we provide additional background information. Defendant entered pleas of not guilty and not guilty by reason of insanity and during his arraignment requested the appointment of "a doctor on the issue of insanity." The trial court appointed Dr. Christina Antoine to evaluate defendant on the issue of his sanity at the time of the shooting. The trial court later appointed a second doctor, Dr. Gary Cavanaugh, pursuant to section 1027, at defendant's request.[5] This was the second evaluation of defendant by Dr. Antoine and Dr. Cavanaugh, as they had previously evaluated defendant's competence to stand trial pursuant to section 1368.[6]

Defendant subsequently moved to exclude Dr. Antoine and Dr. Cavanaugh's testimony at trial on the ground that any information the doctors obtained through their section 1368 competency appointments was inadmissible. The trial court ruled that

---

[4] Defendant also claims the errors resulted in a denial of due process, but we do not consider that claim because he failed to provide supporting argument. (*People v. Jones* (1998) 17 Cal.4th 279, 304.)

[5] Section 1027 provides that when a defendant pleads not guilty by reason of insanity the trial court shall select and appoint at least two but no more than three psychiatrists or licensed psychologists, who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders, to examine the defendant and investigate his or her mental status. (§ 1027, subd. (a).) Any psychiatrist or psychologist appointed by the court may be called by either party to the action or by the court, and shall be subject to all legal objections as to competency and bias and as to qualifications as an expert. (§ 1027, subd. (e).)

[6] Section 1368 describes the procedure for a determination whether a defendant is competent to stand trial where the judge doubts the defendant's mental competence during the pendency of an action and prior to judgment. If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court must order that the question of the defendant's mental competence be determined in a hearing held pursuant to sections 1368.1 and 1369. (§ 1368, subd. (b).)

14

Dr. Antoine and Dr. Cavanaugh could not evaluate defendant on the issue of sanity because the doctors had previously evaluated defendant's competence to stand trial. The trial court declared a mistrial as to the sanity phase of the trial, ordered that the sanity phase be tried before a new jury, and appointed Dr. Rogerson and Dr. Hamon to evaluate defendant on the issue of sanity under section 1026.

Before the sanity phase commenced, however, defendant had an outburst in the courtroom, accusing the trial judge, district attorney, and his defense counsel of conspiring against him, and asserting that a local developer bribed the trial judge and was manipulating the trial. The trial court suspended the proceedings to determine whether defendant was competent to assist his counsel in a rational manner. Defense counsel requested a competency trial. The trial court appointed Dr. Robert Hart, Dr. John Chellsen, and Dr. Wendy Weiss to evaluate defendant's competency. Dr. Hart opined defendant was competent in that he could rationally assist his counsel during trial. But Dr. Chellsen and Dr. Weiss concluded that although defendant understood the nature of the criminal proceedings against him, he was not competent to assist his trial counsel in a rational manner.

The trial court conducted a competency trial. Among other evidence, the trial court admitted evidence regarding the second evaluation of defendant by Dr. Antoine and Dr. Cavanaugh. Following the competency trial, the trial court found defendant competent to assist his counsel, concluding that defendant was malingering. The trial court noted that during the guilt phase trial lasting several weeks, defendant never exhibited delusions concerning the local developer, but spoke about the developer when the trial court was setting the sanity issue for trial. The trial court found the timing of defendant's outburst "quite convenient." It determined defendant could control his behavior and was feigning delusions.

The trial court's decision was based on Dr. Hart's report and testimony and the trial court's observation of the defendant during the competency hearing and all prior

15

proceedings. But the trial court also relied on Dr. Antoine's testimony and the fact that defendant told a fellow inmate that he had a plan to plead insanity. The trial court was not persuaded by the testimony and reports from Dr. Weiss and Dr. Chellsen, saying that Dr. Weiss's testimony was inconsistent and unpersuasive, and Dr. Chellsen's diagnosis of schizophrenia was unsupported by defendant's mental health history and conduct and the opinions of the other doctors.

A

With that background in mind, we turn to defendant's claim that his trial counsel was ineffective in failing to prevent the admission, at the competency trial, of evidence relating to the second evaluation of defendant by Dr. Antoine and Dr. Cavanaugh. Defendant asserts the information obtained from those evaluations was protected from disclosure under the attorney-client privilege because the trial court appointed Dr. Antoine and Dr. Cavanaugh to evaluate defendant pursuant to Evidence Code section 1017.[7] Defendant maintains he did not personally enter a plea of not guilty by reason of insanity during the arraignment; hence Dr. Antoine and Dr. Cavanaugh were not appointed to examine him pursuant to section 1027.

Contrary to defendant's assertion, the record shows that defendant entered a plea of not guilty by reason of insanity at his arraignment, and he confirmed that plea at subsequent hearings and motions. Dr. Antoine and Dr. Cavanaugh were appointed in August 2007 to evaluate defendant's sanity pursuant to section 1027. Information gained from those evaluations was not protected by the attorney-client privilege. (*People v.*

---

[7] Confidential communications between a patient and a psychotherapist are privileged. (Evid. Code, § 1014.) The privilege exists where the psychotherapist is appointed by order of the court, upon the request of defense counsel, in order to assist counsel in advising defendant on whether to enter or withdraw a plea based on insanity. (*Id.* at § 1017, subd. (a).) Communications made as a result of an Evidence Code section 1017 appointment are protected by the attorney-client privilege. (*People v. Lines* (1975) 13 Cal.3d 500, 515.)

16

*Lines, supra,* 13 Cal.3d at p. 515.) Defendant has not established that defense counsel was deficient.

In addition, defendant has not shown prejudice. Even without the challenged evidence, there was substantial evidence supporting the trial court's determination that defendant was competent to stand trial.

A person who is mentally incompetent cannot be tried. (§ 1367, subd. (a); *People v. Ary* (2011) 51 Cal.4th 510, 517 [the trial of a defendant who is mentally incompetent violates the due process clause of the federal Constitution].) A defendant is incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a); *People v. Young* (2005) 34 Cal.4th 1149, 1216.) A defendant is presumed mentally competent unless he or she proves incompetence by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Marks, supra,* 31 Cal.4th at p. 215.) On appeal, we view the record in the light most favorable to the trier of fact's determination and uphold that determination if it is supported by substantial evidence, i.e., evidence that is reasonable, credible, and of solid value.[8] (*People v. Marks, supra,* 31 Cal.4th at p. 215; *People v. Marshall* (1997) 15 Cal.4th 1, 31.)

Dr. Hart opined that defendant could rationally assist his counsel during trial. Dr. Hart was the chief psychiatrist at the jail where defendant was housed. Dr. Hart

---

[8] We disagree with defendant's assessment that an error in admitting Dr. Antoine's testimony and report "infected the entire framework of the competency trial." A structural error is a " 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself' " and is found in a very limited class of cases. (*Johnson v. United States* (1997) 520 U.S. 461, 468-469 [137 L.Ed.2d 718, 728].) Defendant has not shown that the error alleged in this case -- erroneous admission of privileged communications -- fits within the limited class of cases that requires automatic reversal. (*Ibid.*)

17

found defendant logical and goal oriented in his thinking. He observed that during the competency hearing defendant made a "voluntary controlled request to leave [the courtroom,] that actually indicated that he was thinking and planning."

Dr. Hart opined that defendant was malingering or intentionally presenting false symptoms of a mental illness. He said defendant provided what appeared to be intentionally false or inconsistent answers to interview questions. He observed that defendant selected a "strategy" when responding to interview questions. Defendant's mental health records at the jail did not show delusional thinking by defendant. The trial judge who observed defendant during the guilt phase and competency trials also found that defendant's conduct showed that defendant was not suffering from true delusions. Dr. Chellsen conceded it was possible defendant was fabricating delusions. And although Dr. Weiss opined that defendant suffered from a delusional disorder, she could not rule out the possibility that defendant was malingering.

In Dr. Hart's view, the condition of a person who was truly delusional would worsen under stress, such as during cross-examination. But the trial judge found defendant did not mention the local developer at all when defendant was cross-examined for two days. Dr. Chellsen agreed it would be unusual for a delusional schizophrenic to not exhibit his delusions during cross-examination.

Further, Dr. Hart and Dr. Weiss disagreed with Dr. Chellsen's diagnosis of schizophrenia, the diagnosis that formed the basis for Dr. Chellsen's opinion that defendant was not competent to assist his counsel. Dr. Hart testified that defendant's presentation of one fixed delusion is not consistent with a diagnosis of schizophrenia.

Viewing the record in the light most favorable to the trial court's findings, we conclude substantial evidence supported the trial court's determination that defendant did not suffer from a mental disorder that prevented him from assisting his counsel at trial in a rational manner, even if we do not consider Dr. Antoine and Dr. Cavanaugh's testimony and reports. Given the substantial evidence of defendant's competence to

18

stand trial, an objection by defense counsel to the admission of defendant's communications with Dr. Antoine and Dr. Cavanaugh and the reports by Dr. Antoine and Dr. Cavanaugh would not have resulted in a more favorable result for defendant at the competency trial. Accordingly, we reject defendant's ineffective assistance of counsel claim.

To the extent defendant claims his trial counsel erred by failing to object to the appointment of Dr. Antoine and Dr. Cavanaugh in August 2007 to conduct a section 1026 sanity evaluation of defendant when the same doctors had previously evaluated defendant for competency under section 1368, there was no prejudice. The trial court declared a mistrial and appointed two new doctors to examine defendant on the issue of sanity.

B

Defendant also claims the trial court abused its discretion in considering inadmissible hearsay: defendant's out-of-court statement to a fellow inmate that defendant "needed to launch and succeed in an insanity defense."

The hearsay statement was contained in a police report Dr. Hart reviewed in evaluating defendant's competence to stand trial. The inmate who reported defendant's statement did not testify at the competency hearing, and neither did defendant or the officer who prepared the police report. Nevertheless, the trial court considered the truth of defendant's out-of-court statement.

Defendant failed to preserve his appellate claim because he did not object at trial on the grounds raised on appeal. (Evid. Code, § 353, subd. (a).) We will, however, consider the merits of defendant's claim because he also asserts that his counsel was ineffective in failing to object. But even if the trial court erred in considering inadmissible hearsay, and even if defense counsel's performance was deficient in failing to object, defendant's claim fails because he has not established prejudice.

The application of ordinary rules of evidence does not implicate the federal Constitution, and thus we review error in admitting hearsay under the standard set forth

19

in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Harris* (2005) 37 Cal.4th 310, 336.) We examine the entire cause to determine whether it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*Watson, supra,* 46 Cal.2d at p. 836; see also Evid. Code, § 353, subd. (b) [a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless the error resulted in a miscarriage of justice].) The second prong of the test for deciding an ineffective assistance of counsel claim requires a similar analysis. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 217-218; *Strickland, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].)

The trial court's finding that defendant could assist his trial counsel in a rational manner was supported by substantial evidence even in the absence of the challenged hearsay evidence. Based on Dr. Hart's testimony, the trial court's observation of defendant's conduct during the guilt phase and competency trials, and the fact that Dr. Chellsen and Dr. Weiss could not rule out the possibility that defendant was feigning a mental disorder, we are convinced that any error with regard to admitting defendant's statement would not affect the result of the competency trial.

C

Defendant argues the cumulative effect of the erroneous admission of privileged information and defendant's out-of-court statement, and the inadequate performance by his trial counsel, denied him due process of law. We disagree. Even where we have assumed errors, we have concluded that the assumed errors were harmless. For the reasons we have stated, it is not reasonably probable that the trial court would have reached a different competency determination in the absence of the assumed errors. (*People v. Holt* (1984) 37 Cal.3d 436, 458-459 [applying *Watson* standard of review]; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) We also reject defendant's claim

20

that cumulative errors require reversal of the sanity verdict as that claim is premised on the same arguments raised with regard to the competency trial.

IV

Defendant contends the trial court prejudicially erred in denying his motions to discharge his appointed trial counsel.

Defendant sought to relieve his appointed trial attorney, Lance Jacot, on four occasions by making what is commonly referred to as a *Marsden* motion. (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) The first *Marsden* motion was brought before the preliminary hearing; defendant had not yet been held to answer for the charges. Defendant was dissatisfied that Jacot had not interviewed two witnesses. Defendant did not have the names of the witnesses but indicated one witness was a Panda Express cashier with whom defendant spoke one or two days before the shooting, and the second witness was a neighbor. Defendant said Jacot promised to deliver witness statements to defendant but had not done so. Jacot said he anticipated calling witnesses at the preliminary hearing. The trial court denied defendant's *Marsden* motion, noting that defendant's case was only four- or five-months old, the preliminary hearing had not yet been held, and defendant's case was serious and required a lot of attention. The trial court found Jacot competent and prepared, although a little optimistic about when he could get his witness statements completed.

Defendant made another *Marsden* motion less than three weeks later, prior to his arraignment. Defendant sought to replace Jacot because, among other things, Jacot still had not given him the witness statements. Defendant said he wanted to line up his witnesses. Jacot responded that he submitted an investigation request with a return date of about three and a half weeks hence. Jacot pointed out that defendant was just being

21

arraigned and a trial date had not been set.[9] Jacot described other issues in the case that he explored with defendant, along with communications with defendant's sister who provided Jacot evidence she thought was important to the case. The trial court denied the *Marsden* motion, finding insufficient cause to relieve Jacot.

The trial court held another hearing on a *Marsden* motion about three months after the jury returned guilty verdicts. The motion was heard before the judge who presided over the guilt phase of trial. Defendant said his counsel "never got to that witness [referring to defendant's neighbor] at all in the trial. The DA, he was saying, I didn't get cocaine, and that I was doing it the day of the trial [*sic*]. That was a witness we never got to. He assured me, but we never did, we never got testimony on him." Defendant suggested the neighbor could testify that he smelled cocaine coming from defendant's apartment, thereby supporting defendant's claim about smoking cocaine for seven days in his apartment. Jacot responded that his investigators tried but could not locate the neighbor. The trial court denied the *Marsden* motion, finding no substantial showing that Jacot provided inadequate representation.

The trial court heard a fourth *Marsden* motion about 14 months later. Defendant complained, among other things, that Jacot could not locate the neighbor who smelled cocaine coming from defendant's apartment even though counsel assured defendant it would not be a problem to locate that witness. Jacot said the issue of the witness was discussed at prior *Marsden* hearings. He said an investigator had the neighbor's apartment number but no name; however, the investigator eventually obtained the neighbor's name. The trial court determined that Jacot attempted to find the neighbor but

---

[9] Defendant claims Jacot sought to avoid the problem with his delayed investigation by suggesting that the issue had been resolved at a prior *Marsden* hearing. We disagree. Jacot said the fact that no jury trial date had been set was dealt with previously. That fact was indeed discussed at the prior *Marsden* hearing.

was unsuccessful. It concluded that defendant's complaint regarding the neighbor did not create a substantial showing of inadequate representation and denied defendant's *Marsden* motion.

On appeal, defendant again contends his appointed trial counsel was inadequate because he did not promptly interview the neighbor and the neighbor subsequently could not be located. On this basis, he claims the trial court abused its discretion in denying his *Marsden* motions.

"Established principles govern our assessment of whether the [trial] court abused its discretion in denying defendant's *Marsden* motion[s]. 'Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion " 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." ' " (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)

A defendant claiming inadequate representation by counsel must prove that, considering all of the circumstances at the time of counsel's conduct, counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms. (*Strickland, supra*, 466 U.S. at pp. 687-690 [80 L.Ed.2d at pp. 693-695.) The defendant must overcome a strong presumption of reasonable professional assistance because we must be highly deferential to counsel's judgment. (*Id.* at pp. 689-691 [80 L.Ed.2d at pp. 694-695].) Judicial scrutiny of counsel's performance gives wide latitude to counsel's tactical decisions. (*Id.* at pp. 688-689 [80 L.Ed.2d at p. 694].)

23

Defendant's challenge to the denial of his *Marsden* motions fails because he cannot overcome the presumption of adequate representation. A complaint about counsel's decision to delay interviewing potential witnesses is essentially a tactical disagreement which is generally insufficient to compel discharge of counsel. (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Contrary to defendant's claim, defense counsel investigated the witnesses defendant identified. Jacot succeeded in locating one of the witnesses. An investigator working for the defense canvassed the area, but could not find the second witness. Although it is possible defense counsel's investigator could have located the second witness had counsel decided to interview potential witnesses sooner, on the facts before the trial court we are unwilling to conclude that counsel's timing for witness interviews was objectively unreasonable.

In any event, counsel's conduct did not result in the withdrawal of a crucial defense. (*People v. Pope* (1979) 23 Cal.3d 412, 425 [to prove a claim of inadequate trial assistance, defendant "must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense"], overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Diggs* (1986) 177 Cal.App.3d 958, 968-969 [same].) Defendant claims his neighbor would have testified about defendant's cocaine use the week before the shooting. But that fact and a defense based on defendant's cocaine use was presented during the guilt and sanity phases of trial. During the guilt phase, Jacot presented a defense of cocaine-induced psychosis, arguing that prolonged cocaine use rendered defendant incapable of forming the requisite mental states for committing a murder and murder in the first degree. Jacot argued in the sanity phase that defendant was psychotic on the day of the shooting and the psychosis was caused by long-term drug use.

Jacot called witnesses in support of the cocaine-related defense. Defendant testified, in both the guilt and sanity phases, about his heavy cocaine use during the week

before the shooting. A psychologist who examined defendant for the sanity phase also testified about defendant's statements to her that he began to smoke cocaine after Jamie left, and that he was not thinking clearly on the day of the shooting because of his cocaine use. Jamie's mother and sister said, during the guilt phase, that defendant was panicked, frightened, paranoid, and very emotional the week after Jamie left with the children, and defendant did not act like himself. Jamie's mother opined that defendant was under the influence of drugs around the time Jamie was killed, and the mother testified again in the sanity phase about defendant's drug use the week before Jamie's death. Additionally, a drug recognition expert testified at both trials that long term cocaine use can cause psychosis. A forensic toxicologist also testified about cocaine-induced psychosis during the guilt phase.

Jacot's decision to postpone interviewing defendant's neighbor did not result in the withdrawal of a crucial defense, and defendant fails to demonstrate prejudice resulting from Jacot's conduct. (*People v. Fosselman* (1983) 33 Cal.3d 572, 584 ["in cases in which a claim of ineffective assistance of counsel is based on acts or omissions not amounting to withdrawal of a defense, a defendant may prove ineffectiveness if he establishes that . . . counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings"].)

*People v. Shaw* (1984) 35 Cal.3d 535 (*Shaw*), *People v. Jones* (2010) 186 Cal.App.4th 216 (*Jones*), and *People v. Rodriguez* (1977) 73 Cal.App.3d 1023, 1029 (*Rodriguez*) do not help defendant. Counsel in *Shaw* failed to investigate a potentially meritorious defense and did not present any defense in the case. (*Shaw, supra,* 35 Cal.3d at pp. 538, 541-542.) Counsel in *Jones* acknowledged it was possible he failed to contact two percipient witnesses in a timely manner, to the potential detriment of defendant's case; moreover, counsel did not request the help of an investigator to investigate the defendant's version of the events, and counsel did not present any witnesses to support

25

the defendant's claim. (*Jones, supra,* 186 Cal.App.4th at pp. 221, 224-225.) Counsel in *Rodriguez* failed to determine potential witnesses whose testimony may have bolstered defendant's sole defense and discredited the prosecution's eyewitness identification of the defendant as the perpetrator of the charged robberies. (*Rodriguez, supra*, 73 Cal.App.3d at p. 1031.) No such facts are present here.

According to defendant, Jacot mistakenly represented that, at a prior *Marsden* hearing, he submitted a report regarding the search for defendant's neighbor. The record does not indicate the presentation of such a report at a *Marsden* hearing. But defendant does not show how any such misstatement regarding a report evidences incompetent representation in the manner asserted on appeal.

We conclude the trial court acted well within its discretion in finding that defendant failed to establish a substantial impairment of his right to effective assistance of counsel. The trial court did not err in denying defendant's *Marsden* motions.

DISPOSITION

The judgment is affirmed.

                                             MAURO          , J.

We concur:

      RAYE          , P. J.

      NICHOLSON    , J.